J-S81005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: J.R.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.H. | : | |
| | : | No. 1337 MDA 2017 |

Appeal from the Decree August 9, 2017
In the Court of Common Pleas of Dauphin County
Orphans' Court Division, at No(s): 87-AD-2017
CP-22-DP-0000253-2015

BEFORE: PANELLA, J., STABILE, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                **FILED MARCH 09, 2018**

N.H. (Mother) appeals the decree of the Court of Common Pleas of Dauphin County (trial court), entered August 9, 2017, which terminated her parental rights to her daughter, J.R.H. ("Child"), born in August 2015, and the order that changed Child's goal to adoption. Mother's attorney has filed a motion with this Court to withdraw from representation pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. McClendon***, 434 A.2d 1185 (Pa. 1981). We affirm the trial court's decree and order, and grant counsel's motion to withdraw.[1]

Dauphin County Social Services for Children and Youth ("SCY") filed a petition to involuntarily terminate Mother's parental rights to Child and to

---

* Retired Senior Judge assigned to Superior Court.

[1] Mother has never provided the identity of Child's father. The trial court involuntarily terminated the parental rights of Child's "Unknown Father."

change Child's goal to adoption on July 18, 2017. The trial court held a hearing on that petition on August 8, 2017. Testifying at that hearing, in addition to Mother, were SCY caseworkers, Rebecca Yost and Melanie Palmer, and Mother's probation officer, Jessica Leffler.

On August 14, 2015, SCY received a referral regarding Mother's alcohol and substance abuse while pregnant with the as-yet unborn Child. A urine test conducted that same day revealed Mother had a blood alcohol concentration of 0.17% and was positive for both benzodiazepines, a class of psychoactive drugs, and opiates.

Child was born prematurely on August 16, 2015, and placed in the hospital's neo-natal intensive care unit until she was discharged to Mother's care on September 2, 2016. Mother was without housing at that time and resided at the Lourdeshouse shelter for homeless mothers and their infants.

Child came into placement with SCY after two incidents involving Mother's substance abuse while she was at Lourdeshouse. In the first incident, Mother was suspected of being under the influence and would have dropped Child on the floor if another resident had not intervened. In the second incident, Mother was found unresponsive on the floor with several empty pill bottles near her body. After Lourdeshouse staff failed to revive her, Mother was admitted to Community General Hospital.

Following these events, SCY attempted to fashion a safety plan whereby Child's safety could be assured while Mother addressed her substance abuse.

When Mother was unable to produce a viable resource for a safety plan, the trial court verbally ordered Child placed in the care and custody of SCY. SCY filed a dependency petition on October 1, 2015, and, at a shelter care hearing held the same day, the trial court confirmed Child's placement with SCY. The trial court adjudicated Child dependent on October 14, 2015.

Service objectives designed to accomplish reunification with Child adopted at the adjudication and disposition hearing were: 1) maintain communication with SCY; 2) obtain and maintain safe, stable, and sanitary housing; 3) demonstrate stable mental health and an ability to care for Child; 4) remain free of drugs and alcohol; 5) demonstrate an ongoing commitment to Child; 6) identify Child's father; and 7) provide SCY with three urine specimens each week.

Rebecca Yost was Mother's SCY caseworker from November 2015 through May 2016. Ms. Yost was unable to recommend that Child reunite with Mother because Mother never remedied the safety concerns that led to Child's placement. Mother obtained housing in December 2015, but there were safety concerns in that home. The home was unsanitary—and there were pills strewn throughout the home within reach of Child. Prescription medication abuse and mental health instability remained barriers to reunification during Ms. Yost's time as Mother's caseworker.

During a permanency review hearing in 2015, the trial court ordered Mother to stop seeking medication from emergency departments and directed

her treat with a single pain management specialist. The trial court directed Mother to provide SCY with a comprehensive list of her prescriptions. Mother never complied. Ms. Yost was only able to recall "a few occasions" on which Mother submitted to urine screens. On one occasion, Mother alleged she was unable to provide a urine screen because she had not urinated in "around a week."

From late 2015 through early 2016, Mother presented to multiple emergency departments with imaginary ailments seeking prescription pain medication. During a one-week period in February 2016, Mother presented to hospitals on three separate occasions seeking medication. Ms. Yost also recalled a specific incident in which Schuylkill Medical Center refused to prescribe for Mother because of her "pain pill seeking" behavior. After this refusal, Mother returned home and called an ambulance to transport her to another hospital where she alleged the same ailment. Mother refused to authorize Ms. Yost to obtain medical records regarding Mother's frequent emergency department visits.

In 2016, in the final months of Ms. Yost's involvement with Mother, Mother failed to comply with both mental health and substance abuse treatment. Mother was an inpatient at the Pennsylvania Psychiatric Institute for a period. At discharge, staff recommended outpatient mental health counseling. Mother was inconsistent in attending these appointments. SCY attempted to assist by making a referral to a mental health service provider

located near Mother's home. Mother refused to attend because she "wanted to go to a facility that would prescribe Xanax." In March 2016, Mother decompensated and was admitted for inpatient mental health treatment after her Xanax was taken from her. In addition to mental health services, Mother was to participate in drug and alcohol treatment through the Naaman Center. As of April 2016, the facility characterized Mother's progress as "not compliant." At that time, Ms. Yost noted that Mother had not accomplished her service objectives and had not alleviated the concerns that had led to Child's placement.

Mother's new caseworker, Melanie Palmer, began to work with Mother in April 2016 and remained her caseworker through the termination hearing. Ms. Palmer noted that the Mother's prescription narcotic-seeking behavior and unstable mental health continued from 2016 through 2017. Specifically, in July 2017, Mother presented to three different Pinnacle Health emergency departments on the same date seeking pain medication for alleged ailments.

When she was refused medication at the first hospital, she requested ambulance transport to another emergency department. Hospital records from the second visit note there was no ailment that "coincided with the reason for her being at the emergency department." When Mother presented to the third emergency department she acknowledged she had used thirty 30 bags of heroin the previous day and was suffering from withdrawal symptoms. Ms.

Palmer testified further that Mother failed to improve in the areas that drew the most concern for Child's safety.

At the time of the termination hearing on August 8, 2017, Mother was incarcerated for non-compliance with the terms of her probation. Probation officer Jessica Leffler testified to Mother's criminal charges during Child's time in SCY's care. Mother was charged in 2017 for false reports to law enforcement after she claimed to have, "overdosed" and been assaulted with a curtain rod. In a separate criminal episode, Mother was incarcerated on May 9, 2017, for "community safety" after threatening Ms. Palmer's children. Finally, on June 28, 2017, Mother violated her probation by testing positive for opiates. Mother was incarcerated after that violation and she remained incarcerated at the time of the termination hearing. Based on her involvement with Mother since 2016, Ms. Leffler opined that she had a high level of concern for Child if she were to return to Mother's care.

Ms. Palmer testified that termination of Mother's parental rights and a goal change to adoption are both in Child's best interests. Specifically, she noted that Child was placed with her foster parents at the age of six weeks and has remained in that home for nearly two years. Child has "bonded" with her foster parents and refers to her foster mother as "Mom." Child looks to her foster parents for comfort and encouragement. Based on Child's bond with her foster parents, Ms. Palmer stated it would be harmful to remove Child from their home.

Mother acknowledged her ongoing substance abuse and instability. She claimed to be enrolled in substance abuse treatment and asked the court for, "another chance" to establish sobriety and be a resource for Child.

The trial court entered its decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b), and further ordered Child's permanency goal changed to adoption on August 9, 2017. Mother timely filed her notice of appeal.

Mother's attorney, Damian J. DeStefano, Esquire, filed an application to withdraw as counsel. In the accompanying **Anders** brief he raises these two questions:

> 1. Whether the trial court abused its discretion when it changed the goal from reunification to adoption?
>
> 2. Whether the trial court abused its discretion when it involuntarily terminated [Mother's] parental rights?

**Anders** Brief, at 9 (unnecessary capitalization and underlining omitted).

Before we begin our analysis, we must dispose of the motion to withdraw. Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw representation, he must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;
>
> (2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no-merit" letter or *amicus curiae* brief; and

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed *pro se,* or raise any additional points he deems worthy of the court's attention.

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). Counsel must also "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

In the *Anders* brief, counsel must do the following:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

Counsel, in his motion to withdraw as counsel, has stated that he has made a conscientious review of the record, concluded that his client's appeal is wholly frivolous, and stated the reasons for his conclusion. In addition, he

timely mailed his client: (1) a copy of his petition to withdraw; (2) a copy of his ***Anders*** brief; and (3) a letter advising his client of his rights to proceed *pro se* or to retain private counsel if the petition is granted and to raise any additional issues that they deem worthy of consideration. Counsel has filed the required ***Anders*** brief in this Court setting forth the issues he believes might arguably support his client's appeal. Thus, Counsel has satisfied the procedural requirements of ***Anders***. We proceed to examine the issues raised in the ***Anders*** brief to see if we agree they are wholly frivolous.

In her first issue, Mother claims the trial court abused its discretion when it changed Child's goal to adoption from reunification. We disagree.

> In cases involving a court's order changing the [court-ordered] goal ... to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate principles to that record. Therefore, our scope of review is broad.

***In re S.B.***, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted).

"In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." ***In re D.P.***, 972 A.2d 1221, 1227 (Pa. Super. 2009) (citation omitted). The agency bears the burden in proving the change in goal would best serve the child's needs. ***See id***.

> Pursuant to § 6351(f), of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011) (citation omitted).

At the time of SCY's request for a goal change to adoption, Child had been removed from the home by order of the trial court for twenty-three months. The evidence SCY presented to the trial court in the form of the testimony of caseworkers Yost and Palmer demonstrated that a change of goal to adoption would finally permit permanency for Child in a pre-adoptive home. That evidence also demonstrated that Mother, who was still working to maintain sobriety, did not have housing, and did not have employment, was not a resource for Child, and that a goal change to adoption was in Child's best interests. The trial court did not abuse its discretion when it ordered Child's goal changed from reunification to adoption.

We next consider the trial court's decision to terminate Mother's parental rights. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

In order to terminate parental rights pursuant to subsection (a)(8), a petitioner must demonstrate: "(1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the

- 12 -

child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003).

If the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (most citations and internal quotation marks omitted; brackets added and in original).

Subsection (b) does not mandate a formal bonding evaluation. ***See In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). And when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well." ***Id***. (citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d

753, 762 (Pa. Super. 2008) (citation omitted). "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *Id*. (citation omitted).

The trial court properly concluded that termination would best serve the needs and welfare of Child. At the time of termination, Mother had spent nearly twenty-three months attempting to remain sober. When SCY filed its petition, Child had been removed from Mother's care by order of the trial court for twenty-three months. At the time of the termination hearing, Mother was not in a position to care for Child and could not say when she would be able to assume parental duties such as providing housing, support, and safety for Child. Ms. Yost credibly testified that the substance abuse that led to Child's placement in 2015 still existed at the time of termination. Ms. Yost and Ms. Palmer agreed that Mother's substance abuse persisted for the duration of Child's time in care, and new concerns about Mother's mental health emerged following the child's removal from the home.

The trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to subsection (a)(8).

In regard to the best interests and welfare of Child, we quote the trial court's analysis, with approval:

> Mother presented no evidence upon which we may find that a bond exists which, if broken, will cause detriment to [Child]. In contrast, we find that [Child] has bonded with her foster parents and that her best interests are best served in their home. The foster parents are the only parental figures [Child] has ever known. They have provided [Child] with safety, stability and love.

> We will not disrupt the permanency and stability [Child] enjoys based upon the hope that [M]other can remain drug free. To do so would be detrimental to [Child's] best interests.

Trial Court Opinion, 9/20/17, at 11.

The trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to subsection (b).

After conducting an independent review of the record, we agree with counsel there are no non-frivolous issues to be raised on appeal.

We affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(8) and (b), and ordered Child's permanency goal changed to adoption.

Decree and order affirmed. Motion to withdraw as counsel granted.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/9/2018